UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

CRIMINAL ACTION

VERSUS

NO. 24-3-JWD-RLB

ZACCHEUS QUINN

**RULING AND ORDER**

This matter comes before the Court on the *Motion to Dismiss Counts One and Two of the Indictment and to Stay the Proceedings* (Doc. 18) ("*Motion to Dismiss*") filed by Defendant Zaccheus Quinn ("Defendant" or "Quinn"). The Court granted a stay pending the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024), (Doc. 19), and pending the Fifth Circuit's decision in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), (Docs. 27, 28). Following the decisions in those cases, the Government filed the *United States' Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Gov. Opposition*") (Doc. 30). Defendant then filed his *Response to United States' Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Def. Response*") (Doc. 38). The Government then filed the *United States' Reply to Defendant's Response to United States' Memorandum in Opposition to Defendant's Motion to Dismiss* ("*Gov. Reply*") (Doc. 41). Oral argument was scheduled for April 29, 2025, but the Court finds that it is no longer necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties, and it is prepared to rule. For the following reasons, Defendant's *Motion to Dismiss* is denied.

I. **Relevant Background and Parties' Arguments**

Defendant was indicted on January 25, 2024, for two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and one count of possession of an

1

unregistered firearm in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. (Doc. 1 at 1–2.) Relevant to Counts One and Two, Defendant pled guilty in 2016 to two counts of conspiracy to commit armed robbery in the 18th Judicial District Court. (Doc. 9 at 4–5.)

### A. Defendant's *Motion to Dismiss* (Doc. 18) and *Def. Brief* (Doc. 23)

On March 11, 2024, Defendant moved to dismiss Counts One and Two, arguing that 18 U.S.C. § 922(g)(1) violated the Second Amendment as interpreted by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). (Doc. 18-1 at 1.) Defendant argued that 18 U.S.C. § 922(g)(1) was unconstitutional both facially and as applied to him. (*Id.* at 2–9.) In addition, he asked that the Court stay the proceedings in his case until the Supreme Court issued its decision in *Rahimi*. (*Id.* at 9.) The Court granted the stay and ordered that the parties file additional briefing within fourteen days of the Supreme Court's decision in *Rahimi*. (Doc. 19 at 2.)

Following the Supreme Court's decision in *Rahimi* on June 21, 2024, Defendant filed *Defendant's Brief Regarding Defendant's Motion to Dismiss Count One and Count Two of the Indictment* ("*Def. Brief*"). (Doc. 23.) He argued that the Supreme Court's decision in *Rahimi* "does not definitively answer the questions raised in [D]efendant's Motion to Dismiss relative to 18 U.S.C. § 922(g)(1)[]" because the Supreme Court "held that a person 'found by a court to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment.'" (*Id.* at 2 (quoting *Rahimi*, 602 U.S. at 702) (emphasis added by *Def. Brief*).) Defendant argued that the law was still "in flux" and that the Fifth Circuit had yet to rule on the constitutionality of § 922(g)(1). (*Id.*) He urged the Court to continue its stay pending the Fifth Circuit's decision in either *Diaz* or *United States v. Collette*, No. 22-51062, 2024 U.S. App. LEXIS 25601, 2024 WL 4457462 (5th Cir. Oct. 10, 2024). (*Id.* at 2–3.)

### B.     *Gov. Brief* (Doc. 24) and *Gov. Opposition* (Doc. 30)

The Government responded with the *United States' Brief Regarding Stay* ("*Gov. Brief*"). (Doc. 24.) The Government argued that the stay should at that point be lifted because the Supreme Court's decision in *Rahimi* had clarified Second Amendment law both on its face and as applied to Defendant's case. (*Id.* at 1–4.)

The Court granted Defendant's request that the case be held in abeyance pending the Fifth Circuit's decision in *Diaz* and ordered that, following the Fifth Circuit's decision in *Diaz*, the parties submit additional briefing on the *Motion to Dismiss*. (Doc. 27.)

On September 18, 2024, the Fifth Circuit held in *Diaz* that § 922(g)(1) is constitutional both facially and as applied to Diaz. *Diaz*, 116 F.4th at 472. The Government then filed *Gov. Opposition*, arguing that *Bruen*, *Rahimi*, and *Diaz* all support the constitutionality of 922(g)(1). (Doc. 30 at 1.) The Government argues that the Fifth Circuit wrongly decided the first step of the *Bruen* analysis in *Diaz* and that "the pre-existing right to keep and bear arms codified in the Second Amendment's text is not available to felons." (*Id.* at 5.) Next, it argues that the Fifth Circuit rightly decided the second step of the *Bruen* analysis in *Diaz*, such that Defendant's facial challenge is foreclosed and his as-applied challenge is meritless. (*Id.* at 5–6.) The Government contends that at common law, robbery was a felony punishable by death, and "[t]here is thus a historical tradition of punishing accessories to robbery with the death penalty." (*Id.* at 6–7.)

While acknowledging that conspiracy was generally only a misdemeanor, the Government argues that in conjunction with the "severe punishment of armed robbery and accessory crimes at the time of the founding, . . . the historical criminalization of conspiracy[] support[s] disarmament of defendant." (*Id.* at 7.) The Government encourages the Court to follow the Supreme Court's guidance in *Rahimi* "that its precedents 'were not meant to suggest a law trapped in amber.'" (*Id.*

3

at 8 (quoting *Rahimi*, 602 U.S. at 691).) The Government urges the Court to consider disarming Defendant, with his conviction for conspiracy to commit armed robbery, as analogous to the nation's history and traditions. (*Id.* at 9.)

In addition, the Government asserts that "[o]ur country also has a historical tradition of disarming those who are dangerous." (*Id.*) It contends that the Court's "[a]pplication of Section 922(g)(1) to dangerous felons is analogous to the historical surety and going armed laws discussed in *Rahimi*." (*Id.* at 10.) The Government looks to historical laws that punished robbery and burglary with death. (*Id.* at 10–11.) It argues that Louisiana law defines armed robbery as a crime requiring the "use of force or intimidation, while armed with a dangerous weapon." (*Id.* at 11 (quoting La. R.S. 14:64).) The Government urges the Court to consider conspiracy to commit armed robbery as posing as much of a threat to society as armed robbery itself, thereby justifying disarmament of a person convicted of conspiracy to commit armed robbery. (*Id.* at 11–12.)

In the alternative, the Government argues that because Defendant was on parole at the time that he violated § 922(g)(1), he was still serving a criminal sentence, which provides an independent basis for disarmament. (*Id.* at 13.)

### C.     *Def. Response* (Doc. 38)

Defendant filed *Def. Response*, in which he argues that conspiracy to commit armed robbery is not a predicate offense under § 922(g)(1) and would not historically "have resulted in a death sentence or other severe punishment." (Doc. 38 at 4.) Consequently, he asserts, § 922(g)(1) is unconstitutional as applied to him because it goes beyond any historical tradition. (*Id.*) Defendant points to the Fifth Circuit's holding in *Diaz* under the first step of the *Bruen* analysis that felons are in fact protected by the Second Amendment. (*Id.* at 5.)

4

However, Defendant contends that his predicate offense, conspiracy to commit armed robbery, would not have been considered a felony at the time of the founding and is not analogous to any offense that would have been considered a felony at the time of the founding. (*Id.* at 5–6.) Defendant argues that this offense would not have been punished so severely as to warrant permanent disarmament under § 922(g)(1). (*Id.* at 6–7.) Defendant points to a number of founding era laws that did not punish robbery with death. (*Id.* at 7–9.) He urges the Court to consider conspiracy as its own historical analogue, rather than looking at armed robbery or accessory to commit armed robbery. (*Id.* at 9–10.) Defendant further argues that conspiracy to commit armed robbery does not include an element of violence, unlike armed robbery itself, and the Court should therefore reject the Government's dangerousness argument. (*Id.* at 11–12.)

Next, Defendant argues that in prosecuting Defendant under § 922(g)(1), "[t]he federal government is attempting to prosecute under § 922(g)(1) where Louisiana law explicitly permits firearm possession under La. R.S. 14:95.1[,]" which Defendant argues is a violation of federalism. (*Id.* at 13.) Defendant argues that Louisiana state law allows citizens with conspiracy to commit armed robbery convictions "to possess firearms under Louisiana law despite having that felony conviction." (*Id.* at 14.) Defendant argues that the Government "must show a historical tradition where the federal government could punish someone for possessing firearms even when their home state had already determined they were not too dangerous to possess them." (*Id.* at 14–15.)

Finally, Defendant argues that *Diaz* forecloses the Government's argument that "§ 922(g)(1) is constitutional as applied to [Defendant] because he committed the offense while on parole." (*Id.* at 15.) He asserts that a reason for revoking parole is different from a reason to justify a new conviction under § 922(g)(1). (*Id.* at 16.) Defendant contends that the Government's reliance on out-of-circuit precedent should not override the Fifth Circuit's decision in *Diaz*. (*Id.* at 16–17.)

5

**D.     *Gov. Reply* (Doc. 41)**

The Government filed *Gov. Reply*, pointing first to the Fifth Circuit's decision in *United States v. Giglio*, 126 F.4th 1039 (5th Cir. 2025), which it argues supports the contention that the "application of Section 922(g)(1) to defendant is constitutional because defendant was on parole at the time of the charged offense[,]" requiring the Court to deny the *Motion to Dismiss*. (Doc. 41 at 1–2.)

In addition, the Government argues that the "principles of federalism do not bar defendant's prosecution[,]" asserting that "[i]t is self-evident that the federal government is entitled to criminalize behavior that is not criminal at the state level." (*Id.* at 2.) The Government contends that "the Second Amendment analysis prescribed by the Supreme Court in *Bruen* has nothing to do with making federal laws align with state laws, and it does not require that federal laws be compared only to federal analogues." (*Id.* at 3 (citing *Bruen*, 597 U.S. 1).) The Government argues that the Court need only consider whether the "why" and "how" of § 922(g)(1) "is relevantly similar" to the "why" and "how" of historical analogues. (*Id.* at 3.)

The Government asserts that "the Supreme Court has firmly rejected the idea that the permissible scope of firearms regulation was fixed by laws that existed at the founding." (*Id.* at 4 (citing Doc. 30 at 8–9).) Instead, it argues, it must merely "show a tradition of severely punishing someone with a criminal history that is . . . 'analogous to' the defendant's." (*Id.*) The Government argues that not only was robbery punishable with death at common law and in many of the early American colonies, but robbery is also "a species of theft[,]" which the *Diaz* court recognized has a historical tradition of capital punishment and estate forfeiture. (*Id.* at 5.) The Government goes on to dispute the historical sources Defendant relies upon. (*Id.* at 6–11.)

6

Finally, the Government maintains that there is a history and tradition of disarming those who are dangerous which permits the application of § 922(g)(1) to Defendant. (*Id.* at 11.) It argues that *Rahimi* does not reject the disarmament of those found to present a credible threat to the safety of others, while the Fifth Circuit has extended this to permanent disarmament. (*Id.* at 11–12.) The Government then argues that conspiracy to commit armed robbery, which is a violent crime, should be considered to "present a credible threat to the physical safety of others." (*Id.* at 13 (quoting *Rahimi*, 602 U.S. at 700).)

## II. Discussion

### a. The Second Amendment Generally

The felon-in-possession statute makes it a crime for:

> any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[,] . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

Because § 922(g) affects the Second Amendment right to "keep and bear Arms[,]" the Court must conduct a Second Amendment analysis to determine the constitutionality of its application. *Diaz*, 116 F.4th at 462.

The Supreme Court established the Second Amendment standard in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). "This historical inquiry that courts must conduct will often involve reasoning by analogy . . . ." *Id.* at 28. The

question of "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). This involves finding "a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

In *United States v. Rahimi*, the Supreme Court further clarified the "historical analogue" requirement. 602 U.S. at 691. "These precedents were not meant to suggest a law trapped in amber." *Id.* "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. The Court found that 18 U.S.C. 922(g)(8) was constitutional on its face and as applied to Rahimi, because our country's "firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690.

The Fifth Circuit applied this framework to § 922(g)(1) in *Diaz*. 116 F.4th 458. *Diaz* considered the defendant's felon status in the second step of the *Bruen* analysis, collapsing the inquiry "into one question: whether the law is consistent with our Nation's history of firearm regulation." *Id.* at 467 (citing *Rahimi*, 602 U.S. at 692). The Fifth Circuit held "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1) . . . ." *Id.* Thus, the government bears the burden to demonstrate that the application of § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 597 U.S. at 24) (internal quotation marks omitted).

To determine if a historical law is relevantly similar, the Fifth Circuit has said to focus "on the *why* and *how*" and to "ascertain whether the challenged regulation 'impose[s] a comparable

8

burden on the right of armed self-defense' to that imposed by a historically recognized regulation." *United States v. Quiroz*, 125 F.4th 713, 718 (5th Cir. 2025) (quoting *Bruen*, 597 U.S. at 29). In *Diaz*, the Fifth Circuit held that § 922(g)(1)'s justification (the "why") was "relevantly similar" to the examples of punishing felonies with death: "to deter violence and lawlessness." *Diaz*, 116 F.4th at 469. The Fifth Circuit also reasoned that the method by which § 922(g)(1) reaches this goal (the "how")—permanent disarmament—was consistent with historical methods because if felonies were historically punished with death, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.*

The holding in *Diaz* was not a blanket statement that all felonies may serve as a constitutional predicate offense to § 922(g)(1), but only those that "fit[] within this tradition of serious and permanent punishment[,]" such as death or permanent estate forfeiture. *Id.* at 470. *Diaz* addressed a predicate conviction of theft, finding that there was a history and tradition of severe punishment for theft by looking to the historic laws of three states: Massachusetts, New York, and Virginia. *Id.* at 468. Further, the Fifth Circuit found that the historical "going armed" and forfeiture of weapons laws, which "punished 'those who had menaced others with firearms'[,] . . . provide[d] for permanent arms forfeiture as a penalty." *Id.* at 470–71 (citing *Rahimi*, 602 U.S. at 697; Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 53). "Imposing permanent disarmament as a punishment is also within our Nation's history and tradition." *Id.* at 471. The Fifth Circuit held that "'taken together,' laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1) to Diaz." *Id.*

Likewise, in *United States v. Bullock*, the Fifth Circuit rejected a § 922(g)(1) challenge by a defendant with prior convictions for aggravated assault and manslaughter. 123 F.4th 183, 184–

9

85 (5th Cir. 2024). "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 185 (quoting *Rahimi*, 602 U.S. at 693) (internal quotation marks omitted). "The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)); *see also Folajtar v. Attorney Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("The historical touchstone is danger[.]")). The Fifth Circuit reasoned that "[t]here can be no doubt that manslaughter and aggravated assault in this context constitute dangerous and violent crimes." *Id.* (citation omitted). The appellate court looked to the "historical tradition of severely punishing individuals convicted of homicide, a prototypical common law felony considered a 'very dangerous offense[,]'" *id.* (citation omitted), and to the fact that the defendant's conduct was "'relevantly similar' to, and arguably more dangerous than, the 'prototypical affray [which] involved fighting in public,' the precursor to the 'going armed' laws punishable by arms forfeiture," *id.* (quoting *Rahimi*, 602 U.S. at 697).

More recently, in *Quiroz*, the Fifth Circuit addressed 18 U.S.C. § 922(n), possession of a firearm while under indictment for a felony. 125 F.4th at 715. Quiroz was under indictment for burglary and bail jumping. *Id.* The Fifth Circuit analyzed the history of burglary as a capital offense, finding a tradition because seven states at the founding deemed burglary a capital offense. *Id.* at 724. It further said that there need not be unanimity between the states to show history and tradition. *Id.* at 725.

Ultimately, neither the Supreme Court nor the Fifth Circuit has set a minimum number of historic laws required to establish a history and tradition of serious and permanent punishment. In *Diaz*, the Fifth Circuit found a history and tradition looking at the laws of only three states. 116

10

F.4th at 468. In *Quiroz*, again, it was seven. 125 F.4th at 724. Thus, it appears that there is no brightline rule for determining how many states' laws are needed to establish a tradition, but *Diaz* and *Quiroz* provide guidance.

### b. The Second Amendment and Parole

In *United States v. Giglio*, the Fifth Circuit held that "the government may disarm those who continue to serve sentences for felony convictions." 126 F.4th at 1044 (citing *United States v. Contreras*, 125 F.4th 725 (5th Cir. 2025)). The Fifth Circuit employed the two-step *Bruen* analysis to first ask whether the plain text of the Second Amendment covered the defendant's conduct and, upon finding that it did, to proceed to the second step of examining historical analogues for the modern regulation. *Id.* at 1042. The Fifth Circuit cited to the Third Circuit's analysis in *United States v. Moore*, which "looked to founding-era forfeiture laws, which 'temporarily disarmed citizens who had committed a wide range of crimes.'" *Id.* at 1043 (quoting *Moore*, 111 F.4th 266, 269–72 (3d Cir. 2024) *Moore* examined founding-era laws in Pennsylvania, Massachusetts, Virginia, and Kentucky, finding that "[t]hose convicted under each 'could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences.'" *Id.* (quoting *Moore*, 111 F.4th at 271). Because "this 'forfeiture of property and limitation on rights occurred while the convict was serving out his sentence, not only while he was physically in prison,'" the Third Circuit found that the "'historical practice of disarming a convict during his sentence' justified the modern practice of disarming individuals 'serving their sentences on supervised release.'" *Id.* at 1043–44 (quoting *Moore*, 111 F.4th at 271–72).

In addition, the Fifth Circuit in *Giglio* looked at the Sixth Circuit's opinion in *United States v. Goins*, which held that "the government today could justifiably 'disarm those on parole, probation, or supervised release.'" *Id.* at 1044 (quoting *Goins*, 118 F.4th 794, 801–02 (6th Cir.

11

2024)) (cleaned up). The Sixth Circuit looked at "the statutes identified in *Moore* and added examples from three other states." *Id.* (citing *Goins*, 118 F.4th at 802 (collecting statutes from Pennsylvania, Maryland, Massachusetts, North Carolina, Vermont, and Virginia)). The Fifth Circuit found that the laws cited in *Moore* and *Goins* "establish a historical tradition wherein 'convicts could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences.'" *Id.* at 1044 (quoting *Moore*, 111 F.4th at 271) (cleaned up).

The appellate court found that this historical tradition aligned with the "why" "of disarming felons who are still serving out sentences[]"—deterrence, protecting the broader public, and rehabilitation. *Id.* (citing *Moore*, 111 F.4th at 269–70; *Contreras*, 125 F.4th at 732; *Diaz*, 116 F.4th at 469). It likewise found that the historical tradition aligned with the "how"—the Fifth Circuit noted that these historical laws "required forfeiture of *all* chattels" which "justif[ies] the narrower practice of prohibiting possession of *some* (*viz.*, firearms)." *Id.* at 1044–45 (citing *Diaz*, 116 F.4th at 469–70; *cf. Diaz*, 116 F.4th at 469; *Rahimi*, 602 U.S. at 699).

Finally, the Fifth Circuit noted "the unremarkable proposition that those subject to criminal sentences do not enjoy the full panoply of rights guaranteed by our Constitution." *Id.* at 1045.

### c. The Second Amendment and Conspiracy to Commit Armed Robbery

The Fifth Circuit has not yet explicitly addressed whether the offense of conspiracy to commit armed robbery can serve as a predicate offense for § 922(g)(1). However, the Fifth Circuit has explicitly held that a robbery conviction, as a "theft-related felony conviction[]," meant that a defendant's as-applied challenge was foreclosed by *Diaz*. *United States v. Schnur*, 132 F.4th 863, 871 (5th Cir. 2025). It further noted "that [the defendant]'s robbery conviction might also fall under

12

the history and tradition of disarming violent criminals[,]" acknowledging that he was initially charged "with armed robbery, but he later pleaded guilty to simple robbery." *Id.* at 870 n.5.

Beyond this indication from the Fifth Circuit, the historical analogues for armed robbery also support a finding that armed robbery is a constitutional predicate offense for § 922(g)(1). Blackstone defined a felony as "an offen[s]e which occasions a total forfeiture of either lands or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Robbery was historically considered a felony at common law. *Id.* at 96; Henry John Stephen, *Summary of the Criminal Law*, 97 (1840). In addition, multiple states punished robbery with death, prison, and/or estate forfeiture at the time of the founding. John M. Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 Va. L. Rev. 1223, 1227 & nn. 17–22 (1969) (pointing to Connecticut, Massachusetts, New Hampshire, New York, and Rhode Island as punishing robbery with death at the time of the founding; Connecticut (beginning in 1796), Maryland, and Pennsylvania as punishing robbery with prison; and Pennsylvania as punishing robbery with estate forfeiture).

### d. Analysis

First, the Court addresses Defendant's facial challenge to § 922(g)(1). As the Fifth Circuit held in *Diaz* that § 922(g)(1) is facially constitutional, 116 F.4th at 472, Defendant's facial challenge is foreclosed. The Court will evaluate only whether § 922(g)(1) is unconstitutional as applied to Defendant.

The Court turns to the question of whether "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)," and, in accordance with the Fifth Circuit holding in *Diaz*, finds that it does. 116 F.4th at 467. In addition, the Court notes that the Fifth Circuit has

repeatedly rejected the Government's argument that a felon is not a member of "the people" protected by the Second Amendment. *See*, *e.g.*, *id.* at 466; *Schnur*, 132 F.4th at 867. Defendant is therefore one of "the people" protected by the Second Amendment. However, his "status as a felon is relevant to [the Court's] analysis . . . in *Bruen*'s second step of whether regulating firearm use in this way is 'consistent with the Nation's historical tradition[.]'" *Diaz*, 116 F.4th at 466–67 (quoting *Bruen*, 597 U.S. at 24).

Next, the Court looks at whether the application of § 922(g)(1) in this case is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 467 (quoting *Bruen*, 597 U.S. at 24) (internal quotation marks omitted). With respect to Defendant's status on parole, the Court finds for the same reasons given in *Giglio*, that Defendant's disarmament while on parole for a previous felony conviction is in line with "our historical tradition of disarming individuals subject to ongoing criminal punishment," meaning that "§ 922(g)(1) is constitutional as applied" to Defendant. 126 F.4th at 1047. Defendant pled guilty in 2016 to two counts of conspiracy to commit armed robbery. (Doc. 9 at 4–5.) On the first count, he was sentenced to 40 years imprisonment, 22 of which were suspended, followed by 5 years of probation, with credit for time served; on the second count, he was sentenced to 5 years imprisonment, to run concurrent. (*Id.* at 5.) Defendant was released on parole on June 25, 2020, at which point his probation also began. (*Id.*) Although his probation terminated on December 25, 2022, due to earned compliance credits, Defendant's projected full term parole expiration date is not until December 4, 2033. (*Id.*) Defendant was indicted for the instant offense on January 25, 2024, while still on parole. (Doc. 1 at 1–2; Doc. 9 at 5.) As the Fifth Circuit found in *Giglio*, there are analogous historical traditions justifying disarming those currently on parole for felony convictions. 126 F.4th at 1047. Accordingly, §

14

922(g)(1) is constitutional as applied to Defendant with respect to his status as a parolee at the time of the instant offense.

While this analysis leads the Court to deny the *Motion to Dismiss*, the Court will also address Defendant's argument that conspiracy to commit armed robbery is not a constitutional predicate for § 922(g)(1). Although the Fifth Circuit has not explicitly addressed *conspiracy* to commit armed robbery, it has held that a robbery conviction foreclosed an as-applied challenge to § 922(g)(1). *Schnur*, 132 F.4th at 871.

Defendant argues that, while armed robbery may be a predicate offense for § 922(g)(1), conspiracy to commit armed robbery may not be. (Doc. 38 at 6–7.) In support, Defendant points to founding era laws that punished conspiracy only as a misdemeanor.

Defendant has presented no cases—nor is the Court aware of any cases—in which any other court has treated conspiracy to commit an offense as distinguishable from the offense for the purposes of a § 922(g)(1) analysis. Indeed, the Court can find no §922(g)(1) case in which any court has analyzed conspiracy as a misdemeanor without consideration of what, precisely, the defendant was convicted of conspiring to do. *See, e.g.*, *United States v. Rodriguez*, No. 23-2730, 2024 U.S. App. LEXIS 18166, 2024 WL 3518307 (3d Cir. July 24, 2024) (upholding a § 922(g)(1) conviction against a constitutional attack from a defendant whose only prior felony conviction was for a drug-trafficking conspiracy offense); *Bailey v. Garland*, No. 1:23-cv-422, 2024 U.S. Dist. LEXIS 146301, 2024 WL 3849444 (S.D. Ohio Aug. 15, 2024) (holding § 922(g)(1) constitutional as applied to a defendant whose only previous convictions were for conspiracy to commit wire fraud and wire fraud); *United States v. Arrington*, No. TDC-19-0532, 2024 U.S. Dist. LEXIS 179384, 2024 WL 4362160 (D. Md. Sep. 30, 2024) (holding § 922(g)(1) constitutional as applied to a defendant whose criminal record included conspiracy to commit robbery, which the court

described as a violent offense); *Foster v. Garland*, No. 1:23-CV-02668-ELR, 2024 U.S. Dist. LEXIS 176402, 2024 WL 4304948 (N.D. Ga. July 30, 2024) (holding § 922(g)(1) constitutional as applied to a defendant whose only prior conviction was for conspiracy to commit securities, mail, wire, and bank fraud); *United States v. Dollison*, No. 3:180cr-00066-SLG, 2024 U.S. Dist. LEXIS 163912, 2024 WL 4145617 (D. Alaska Sep. 11, 2024) (holding, in a post-conviction collateral attack, that § 922(g)(1) was constitutional as applied to a defendant who had been previously convicted of a drug conspiracy charge).

Louisiana's criminal conspiracy statute requires not only an "agreement or combination of two or more persons for the specific purpose of committing any crime;" it also requires an "act in furtherance of the object of the agreement or combination." La. R.S. 14:26(A). Louisiana is thus one of those states that requires an overt act by one of the conspirators. In this respect, Louisiana's criminal conspiracy statute goes beyond the common law crime of conspiracy, which made a conspiracy "punishable even though no act was done beyond the mere making of the agreement." Wayne R. Lafave, 2 Substantive Criminal Law (3d ed.) § 12.2(b) (citing *King v. Gill*, 106 Eng. Rep. 341 (1818); *Poulterers' Case*, 77 Eng. Rep. 813 (1611); *Thompson v. State*, 106 Ala. 67, 17 So. 512 (1895); *Garland v. State*, 112 Md. 83, 75 A. 631 (1910)).

A conspiracy to commit armed robbery in Louisiana, therefore, requires an act in furtherance of the armed robbery—not merely an agreement to commit the armed robbery. *See, e.g.*, *State v. Broussard*, 49,240 (La. App. 2 Cir 10/01/14), 149 So. 3d 446; *State v. Davis*, 12-512 (La. App. 5 Cir 04/24/13), 115 So. 3d 68. The closest historical analogues to Louisiana's modern offense of conspiracy to commit armed robbery are thus not historical common law conspiracy statutes (which, again, required no more than a mere agreement) but historical robbery, accessory to robbery, and aiding and abetting robbery statutes.

16

Robbery was, without any doubt, a felony at common law and at the time of the founding. Blackstone defined a felony as "an offen[s]e which occasions a total forfeiture of either lands or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." Blackstone, 4 William Blackstone, *Commentaries* at *95. Robbery was historically considered a felony at common law. *Id.* at *96; Henry John Stephen, *Summary of the Criminal Law* 97 (1840). British law, at the time of the founding, made even attempted robbery "a felony transportable for seven years." 4 William Blackstone, *Commentaries* at *242.

Founding era governments punished armed robbery—and attempted armed robbery, aiding and abetting armed robbery, or accessory to armed robbery—in a variety of ways. New York, for example, punished not only robbery but also aiding, abetting, assisting, counseling, hiring, or commanding another in committing a robbery with death by hanging. Thomas Greenleaf, *Laws of the States of New-York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive* (1792–1797).

In founding-era Massachusetts, robbery itself was punishable with death, while attempted armed robbery was punishable with a fine of one thousand pounds, whipping, imprisonment, pillorying, "setting on the gallows with a rope about his neck and the other end thereof thrown over the gallows," and/or hard labor not exceeding three years. An Act for the Punishment of Robbery, 1784 Mass. Acts & Laws January Session 135. Assisting, aiding, abetting, counseling, hiring, commanding, or procuring a person to commit a robbery was "considered as an accessory before the fact" and was likewise punishable with death. *Id.* at 169.

South Carolina, too, punished robbery with death in the colonial era. John Faucheraud Grimke, *The Public Laws of the State of South-Carolina, from Its First Establishment as a British*

17

*Province down to the Year 1790, Inclusive* (1790), 57–58. It punished "the Counsellors and Contrivers of Theft and other Felonies," those who "encouraged" robberies by buying or receiving stolen goods, and accessories to robbery with the same punishment—death—as those who committed the underlying felony. *Id.* at 86, 92.

In founding-era Connecticut, armed robbery was likewise punishable with death. An Act for the Punishment of Burglary and Robbery, 1783 Conn. Acts 633, 633 (Timothy Green 1783).

Founding-era Vermont, likewise, punished armed robbery with death. Statutes of the State of Vermont, Passed by the Legislature in February and March 1787, 68–69 (George Hough & Alden Spooner 1787).

Finally, as a Spanish colony in 1770, Louisiana punished "forcible robbery" with death. *Ancient Jurisprudence of Louisiana: Ordinances and Instructions of Don Alexander O'Reilly*, 29 Louisiana Law Journal 1, 48 (Aug. 1841).

There is, therefore, a clear historical tradition of punishing not only armed robbery but also aiding, abetting, or accessory to robbery with capital punishment. In addition to capital punishment, as Blackstone noted, "the true criterion of felony is forfeiture . . . in all felonies which are punishable with death, the offender loses all his lands in fee-simple, and also his goods and chattels; in such as are not so punishable, his goods and chattels only." 4 William Blackstone, *Commentaries* at *97. Even if, as Defendant argues, robbery was not universally punishable with death in the founding era colonies, (Doc. 38 at 7–9), as a felony, it could remain punishable with forfeiture. And as the Fifth Circuit has held, where historical laws "required forfeiture of *all* chattels," modern statutes are "justif[ied] [in] the narrower practice of prohibiting possession of *some* (*viz.*, firearms)." *Giglio*, 126 F.4th at 1044 (citing *Diaz*, 116 F.4th at 469–70; *cf. Diaz*, 116 F.4th at 469; *Rahimi*, 602 U.S. at 699).

18

The Court also finds that § 922(g)(1) comports with both the "why" and "how" of these historical analogues. First, as the Fifth Circuit held in *Diaz* with respect to the "why," "[t]he justification for § 922(g)(1) is relevantly similar to that of" historical felonies: "to deter violence and lawlessness." 116 F.4th at 469. As to the "how," the Fifth Circuit in *Diaz* pointed to the permanence of both capital punishment and most historical forfeiture laws. *Id.* As another Fifth Circuit panel observed, "[o]bviously, if one is dead, they can no longer possess a firearm. Similarly, a permanent ban on the use of firearms—what § 922(g)(1) imposes—makes it so someone can never again possess a firearm." *Contreras*, 125 F.4th at 730. *Diaz* also held that "'[t]aken together, laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1)" where the predicate offense was vehicle theft. 116 F.4th at 471. And another Fifth Circuit panel found in *Schnur* that a robbery conviction is also "theft-related felony conviction[]" subject to the holding in *Diaz*. 132 F.4th at 871.

The Court therefore concludes that Louisiana's conspiracy to commit armed robbery statute, which requires an overt act in furtherance of the conspiracy, has a historical analogue in founding era laws that prohibited hiring, commanding, procuring, counselling, encouraging, contriving with, aiding, abetting, or assisting another in committing robbery. In the founding era, violations of these statutes were punishable with death. Consequently, disarming Defendant under § 922(g)(1) based on his predicate conviction for conspiracy to commit armed robbery "fits within this tradition of serious and permanent punishment." *Diaz*, 116 F.4th at 470.

For all of the above reasons, Defendant's constitutional challenges fail.

### III. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Counts One and Two of the Indictment* (Doc. 18) by Defendant Zaccheus Quinn is **DENIED**.

Signed in Baton Rouge, Louisiana, on April 22, 2025.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**