**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**

**CRIMINAL ACTION**

**VERSUS**

**NO. 24-3-JWD-RLB**

**ZACCHEUS QUINN**

**RULING AND ORDER**

This matter comes before the Court on the *Motion to Suppress* (Doc. 53) filed by Defendant Zaccheus Quinn. The Government filed an *Opposition to Defendant's Motion to Suppress* ("*Opposition*") (Doc. 55). A hearing was held on August 14, 2025, regarding the *Motion to Suppress*. (Doc. 59.) The parties then filed post-hearing briefs (Docs. 61, 62) and responses (Docs. 63, 64). The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's *Motion to Suppress* is denied.

**I.     BACKGROUND**

Defendant pled guilty to Conspiracy to Commit Armed Robbery in the 18th Judicial District Court on August 3, 2016. (Doc. 9 at 4.) On June 25, 2020, he was released on probation, which was due to end on December 25, 2022, with a "projected full term parole expiration date" of December 4, 2033. (*Id.* at 5.) On October 20, 2023, Defendant was arrested outside of his residence pursuant to a warrant issued by the Louisiana Committee on Parole. (Doc. 55 at 3.) A search of his residence led to the seizure of multiple firearms. (*Id.* at 3–4.) On January 25, 2024, Defendant was indicted by a federal grand jury for two counts of possession of firearms by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and one count of possession of an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. (Doc. 1 at 1–2.) He was arrested on the federal charges on February 14, 2024. (Doc. 6 at 1.)

1

II.    PARTIES' ARGUMENTS

A.    Initial Briefs

i.    *Defendant's Motion to Suppress (Doc. 53)*

Defendant argues that parole officers conducted a warrantless search of his residence without a reasonable suspicion that he had been or was engaging in criminal activity. (Doc. 53 at 2.) Defendant acknowledges that he was released on parole by the Louisiana Department of Public Safety and Corrections on June 25, 2020, which required him to "agree to visits by his parole officer at any time." (Doc. 53-1 at 1 (citing Doc. 53-2 at 2).) It also required "that he agree to searches of his residence when reasonable suspicion exists that he is or has engaged in criminal activity." (*Id.* (citing Doc. 53-2 at 2).)

According to Defendant, on October 20, 2022, multiple parole officers went to Defendant's residence pursuant to an arrest warrant issued by the Louisiana Committee on Parole "based on information relayed to it by the FBI Joint Terrorism Task Force." (*Id.* at 1–2 (citing Doc. 53-3 at 2).) When "the agents arrived at the residence, Mr. Quinn exited the front door and was taken [into] custody without incident." (*Id.* at 2 (citing Doc. 53-4 at 2).) While Quinn sat in an officer's vehicle, the officers "'cleared the residence' prior to conducting a 'residence check.'" (*Id.* (citing Doc. 53-4 at 2).) During that check, "officers found several firearms underneath a bed in a room that was not Mr. Quinn's." (*Id.*) In addition, Defendant argues, "the clearing of the residence transitioned into a 'search of [Defendant's] bedroom' where, *inter alia*, an additional firearm was discovered." (*Id.* (citing Doc. 53-4 at 2).) Defendant asserts that this search was done without a warrant, in violation of the Fourth Amendment. (*Id.*)

Defendant contends that he has standing to challenge the search because "[t]he residence searched was Mr. Quinn's registered address with the Louisiana Parole Board[.]" (*Id.* at 3.) He also

argues that although, as a parolee, he has a diminished expectation of privacy, he still retains some Fourth Amendment rights, and his home cannot be searched without reasonable suspicion. (*Id.* at 4–7.) Finally, Defendant argues that the search of his home was not, in fact, supported by reasonable suspicion. (*Id.* at 7.) He notes that the arrest report does not include facts to suggest "that there was evidence of criminal activity in Mr. Quinn's residence." (*Id.* at 7–8.) In the alternative, Defendant argues that if this was considered a home visit or residence check, "it at some point transformed into a search." (*Id.* at 8.)

### ii. *Government's Opposition (Doc. 55)*

The Government opposes Defendant's motion. As background, the Government states that "[o]n or about September 21, 2023, the Federal Bureau of Investigation ('FBI'), through the Guardian Program, received a complaint surrounding Zaccheus S. Quinn's YouTube videos indicating possible regulatory violations issued by the Federal Aviation Administration and federal firearm statutes." (Doc. 55 at 1.) After review and investigation, FBI Task Force Officer Rob Chambers found that the YouTube page belonged to Defendant and showed Defendant discharging firearms. (*Id.*) Chambers also learned that Defendant had a premium membership at a firing range in Baton Rouge, Louisiana, which sold firearms and ammunition. (*Id.*) This firing range had sold targets, ammunition, and range time to Defendant. (*Id.* at 2.) It had also rented him a Staccato 9mm #2255 pistol. (*Id.*) Chambers reviewed video footage from the firing range that showed "the arrival of Quinn and a companion, identified as 'D.W.,' at the parking lot of the firing range[]" and "Quinn retriev[ing] a black rifle case from the vehicle's trunk[,]" from which the footage later showed him taking a green pistol and an AR-15 style rifle. (*Id.*) The footage also showed Defendant obtaining the Staccato rental pistol. (*Id.*) It showed Defendant firing these guns, as well as a Glock pistol. (*Id.* at 2–3.)

At the time, Defendant was on parole following a felony conviction for conspiracy to commit armed robbery in the 18th Judicial District Court. (*Id.* at 3.) According to the Government, "[o]ne of the conditions of parole was that Quinn agreed to searches of his person, property, and residence, when reasonable suspicion existed that he engaged in criminal activity." (*Id.*) "Chambers shared his investigation with the Division of Probation and Parole in West Baton Rouge Parish[]" on October 17, 2023. (*Id.*) "On or about October 20, 2023, the Louisiana Committee on Parole issued a warrant for Quinn's arrest." (*Id.*) Parole officers then went to Quinn's residence, "where they found him outside the premises and arrested [him] immediately." (*Id.*) The parole officers subsequently "entered the residence to ensure nobody was inside the premises before undertaking a residence check." (*Id.*) They "observed firearms inside[,]" which they seized. (*Id.*)

The Government argues that it had reasonable suspicion to search the premises because the parole officers' "information was not stale." (*Id.* at 5.) It contends that staleness depends on the specific facts and circumstances of the case, such that "parole officers engaged in a warrantless search of a residence [must] possess reasonable suspicion to believe that evidence exists of a violation of a crime or a condition of parole[.]" (*Id.* at 4–5 (citing *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984); *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000); *United States v. Thomas*, 997 F.3d 603, 610 (5th Cir. 2021).) The Government contends that "[c]ertain items are likely to be kept for long periods of time at one's residence[,]" (*id.* at 5 (citing *United States v. Davis*, 2013 WL 3148712, at *4–5 & n.7 (M.D. La. June 19, 2013); *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008)), and that weapons, in particular, "are likely to be retained by a suspect for some time following the commission of a crime[,]" (*id.* (collecting out-of-circuit cases)).

The Government asserts that in the instant case, the information was not stale because Defendant "was open about his conduct[,]" frequently visiting a firing range from which he "purchased a premium membership allowing him to obtain firearm related merchandise . . . at reduced prices." (*Id.*) Defendant "behaved as though no reason existed for him to conceal firearms at any place outside his residence." (*Id.*) In addition, "he allowed others to videotape his criminal conduct." (*Id.*) The Government further claims that the video footage from the firing range demonstrated that Defendant "possessed an ability to fieldstrip a semiautomatic pistol and reassemble it, displaying a proficient knowledge of firearms." (*Id.* at 6.) It argues that the video shows him "removing a pistol case from his vehicle and unabashedly walking with it into the firing range" in June of 2023. (*Id.*) According to the Government, Defendant "remained at the same address" during his parole and "during his firearm related violations up until the search." (*Id.*) The Government asserts that Defendant made no attempts at secrecy. (*Id.*) It contends that the parole officers "possessed reliable information from Task Force Officer Chambers, including videotaped evidence," which it argues "met the lower standard of 'reasonable suspicion' and everything which follows such a lower threshold, such as 'staleness,' justifying the warrantless search of Quinn's residence." (*Id.*)

The Government also outlines the timeline of the FBI's investigation through the parole officers' search. (*Id.*) The Government notes that "[l]ess than a month elapsed from the time the FBI began this investigation until the search of the defendant's residence by parole officers." (*Id.*) It also notes that "[a]pproximately three months and 21 days elapsed from the date video footage captured Quinn in the firing range, possessing firearms, until October 20, 2023, when parole officers searched his residence[,]" and "[a]pproximately three months and six days passed from July 14, 2023, the date Quinn renewed his premium memberships with the gun range[,] until the

5

search at his residence." (*Id.* at 4.) It argues that "[l]aw-enforcement officers reacted promptly by arresting [Defendant] and then searching his residence." (*Id.* at 6.)

**B.    The Suppression Hearing**

At the hearing on August 14, 2025, the Court heard testimony from Agent Robert Chambers, Agent Dawson Allain, Agent Kerry Smith, and Agent Jacob Drummond. (Doc. 59 at 1.) Agent Chambers, then an East Baton Rouge Sheriff's Office lieutenant assigned to the FBI Task Force, testified that Defendant first came to the attention of the FBI via a Guardian complaint, which Chambers testified typically has to do with violations of Federal Aviation Agency regulations. (Hearing Aug. 14, 2025.) Chambers testified that this complaint led him to a YouTube channel in Defendant's name, which showed videos of Defendant engaged in tactical shooting while wearing battle gear. (*Id.*) It also showed Defendant at a firing range, which Chambers recognized as Range USA. (*Id.*)

Chambers testified that he went to Range USA, where he discovered that Defendant had a premium membership. (*Id.*) At Range USA, Chambers spoke to a manager of the firing range, who recognized Quinn and provided Chambers with receipts related to Quinn's patronage of the firing range, as well as video of him at the firing range. (*Id.*) These receipts and videos, along with screenshots from the videos, were entered into evidence without objections as Government's Exhibits 1 through 38. (Doc. 60 at 1–2.) After viewing these videos, which depicted Defendant entering the range, firing multiple weapons, and interacting with a cashier at the range, Chambers sent a synopsis of Defendant's actions to Darla Green, from the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, informing her that he believed Defendant was violating the terms of his parole. (Hearing Aug. 14, 2025.) Chambers acknowledged that he did not believe that he had probable cause to arrest Defendant at the time,

but he had pulled up Defendant's certificate of parole on NCIC, which showed Quinn was on parole until 2033. (*Id.*) As a result, he chose to communicate his findings to Probation and Parole so that they could pursue any appropriate actions while he continued his investigation. (*Id.*)

Next, the Court heard testimony from Dawson Allain, from the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, who was part of the arrest team for Defendant. (*Id.*) Allain testified that the team had a parole warrant for Quinn's arrest and made contact with him outside of his home, after which they cleared the house. (*Id.*) He informed the Court that clearing the house meant searching for other people inside the house, which entailed looking in rooms, closets, crawl spaces, or anywhere else a person could hide. (*Id.*) Allain stated that, during this process, he saw a crossbow as well as devices that could be explosives or used to make explosives. (*Id.*) He did not see any people. (*Id.*)

Subsequently, Allain participated in a search of the house, which uncovered other items in the bedroom and the room across from the bedroom. (*Id.*) He testified that he did not personally find any firearms. (*Id.*) Allain also informed the Court that he had no knowledge of Quinn before that day, and that all he knew about Quinn was that he had a parole warrant, that there was a video of him at a range with firearms, and that he might have weapons in his residence. (*Id.*) He testified that Quinn was waiting outside when the parole officers arrived in unmarked units and four or five officers stepped out with weapons drawn. (*Id.*) Allain did not *Mirandize* Quinn. (*Id.*)

The Court then heard testimony from Kerri Smith, a supervisor at West Baton Rouge District Probation and Parole. (*Id.*) She stated that Agent Gracie Graffia was Quinn's parole officer at the time. (*Id.*) Smith explained that parole officers can, given reasonable suspicion, conduct a warrantless search a parolee's residence. (*Id.*) She pointed to Condition Nine of the certificate of parole, which allows for warrantless searches when there is reasonable suspicion that a subject is

7

or has been engaged in criminal activity. (*Id.*) Smith also testified as to Defendant's conditions of parole and as to the search. (*Id.*) The parole warrant was admitted as the Government's Exhibit 39. (Doc. 60 at 2.) Smith acknowledged that the warrant was based on the information received from Chambers but that no one had ever communicated to her that they had seen Quinn with a firearm in his home. (Hearing Aug. 14, 2025.)

Next, the Court heard testimony from Jacob Drummond, a member of the Probation and Parole ATF Task Force who was part of the team that arrested Quinn. (*Id.*) Drummond testified that he received information about the basis for the arrest earlier that day from his supervisor, who informed him that Quinn was a member of the local firing range, had been going to the range, had been observed carrying a firearms case into the range, and was on video at the range. (*Id.*) Drummond testified that the team followed procedure in going to Quinn's house, taking him into custody, and clearing the house for officer safety. (*Id.*) He stated that he observed a crossbow on the floor in plain view while clearing the house and was notified that another officer had observed firearms under a bed. (*Id.*)

Drummond testified that he then participated in a search of the house, during which he found a twelve-gauge shotgun under the bed in the bedroom across from Defendant's room and two rifle cases next to the shotgun, each of which contained an additional firearm. (*Id.*) In Quinn's bedroom, Drummond testified that he found a nine millimeter pistol on the top shelf of the closet, as well as magazines, ammunition, a micro-conversion unit to extend a pistol grip, two threaded end caps that he believed were homemade silencers under the bed, a pistol magazine in the dresser, and a ghillie suit for camouflage in wooded areas. (*Id.*). He was not the officer who took Quinn into custody and did not read him his *Miranda* rights, but he testified that an officer did advise Quinn of his rights when Quinn was in custody in the parole unit. (*Id.*) Drummond further testified

that Quinn did not make a statement, and to his knowledge the only question Quinn was asked was whether anyone else was in the residence, which he believed Quinn did not answer. (*Id.*)

At the hearing, Defense counsel argued that the plain meaning of the conditions of parole was that a parolee's residence could be searched by "my" (i.e., the parolee's) parole officer, and that this certificate of parole acts as a contract. (*Id.*) He noted that this search was not made by Defendant's parole officer, Gracie Graffia. (*Id.*)

Both Defendant and the Government focused at the hearing on the questions of staleness and what constitutes reasonable suspicion in a case like this. (*Id.*)

## C.    Post-Hearing Briefing

### i.    *Defendant's Post-Hearing Brief (Doc. 61)*

In his *Post-Hearing Brief*, Defendant argues that the evidence presented at the suppression hearing held on August 14, 2025, supports his suppression motion. (Doc. 61 at 1.) First, he reviews the evidence presented at the suppression hearing. (*Id.* at 1–4.) He emphasizes that Chambers did not believe that he had probable cause for a warrant to search Quinn's residence and that none of the agents present on the day of Quinn's arrest were his assigned parole officer. (*Id.* at 2–4.)

Defendant then addresses Parole Condition Nine, which states: "I agree to visits at my residence or place of employment by my Parole Officer at any time. I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity." (*Id.* at 4 (citing Doc. 53-2 at 2).) Defendant argues that this language raises the question of whether the initial search was, in fact, a residence check. (*Id.* at 5.) In the alternative, he contends that, if it was a protective sweep, the officers were required to "have 'reasonable grounds to believe there [are] people inside the house who pose[ ] a security risk[.]'"

(*Id.* (quoting *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005)).) Defendant avers that no officer articulated any such suspicions. (*Id.* at 5–6.)

Next, Defendant argues that, because none of the involved agents or officers were the parole officer assigned to Quinn, they were not authorized to conduct a residence check under Parole Condition Nine or Louisiana Revised Statutes § 15:574.4.2. (*Id.* at 6.) While Defendant acknowledges that the search could be justified under the second sentence of Parole Condition Nine, he argues that there was no reasonable suspicion that Quinn had been engaged in criminal activity because the information was stale "and there was no nexus between the thing searched and the evidence hoped to be gathered." (*Id.* at 6–7.)

Defendant then asserts that the search was not "necessary in the performance of [the parole officers'] duties and reasonable in light of the total circumstances." (*Id.* at 7 (quoting *State v. Bolden*, 09-33 (La. App. 5 Cir. 5/12/09), 13 So. 3d 1168, 1171).) He contends that because Quinn was already arrested at the time the search was conducted, there was no need to conduct the search in order to ensure Quinn "was in compliance with his parole conditions." (*Id.* at 8.) Instead, he asserts, they "were doing so in order to help the FBI gather evidence against Mr. Quinn for the federal charges he now faces." (*Id.*)

Defendant turns next to his arguments regarding staleness, arguing that the facts do not support a finding of reasonable suspicion. (*Id.* at 9–10.) He argues that Defendant's possession of firearms at Range USA over the course of six weeks do not show longstanding ongoing criminal activity, and that there is no evidence that Defendant continued going to Range USA after June of 2023. (*Id.* at 10.) Defendant further argues that guns are not the type of evidence likely to be retained for long periods so as to justify a search after some delay. (*Id.*) Finally, he maintains that there must be a nexus between the evidence and the location of the search (here, Quinn's home),

which Defendant argues is missing in this case. (*Id.* at 10–11.) Defendant suggests that the parole condition language of "am or have been engaged in criminal activity" has no bearing on the staleness inquiry. (*Id.* at 14.)

ii.  *Government's Reply to Defendant's Post Hearing Brief (Doc. 63)*

The Government first addresses Defendant's contention that only his parole officer could search his residence by pointing to *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843 (2006), which, it argues, allow for searches by any parole officer based on reasonable suspicion. (Doc. 63 at 1–2.) Turning to Louisiana law, the Government looks at the restrictions set forth by the Department of Public Safety and Corrections, which maintains legal custody over parolees. (*Id.* at 3.) The Government asserts that the second clause of Parole Condition Nine "authorizes a warrantless search of the parolee's residence if there exists reasonable suspicion to believe he has engaged in criminal activity while on parole. It did not require the existence of a reasonable suspicion to believe that evidence of a parole violation would be found at the residence." (*Id.* at 4.) The Government maintains that, under *Samson*, Parole Condition Nine is constitutional and therefore staleness is irrelevant. (*Id.* at 4–5.) The government also contends that it does not matter whether Quinn's assigned parole officer participated in the search because the other officers were all operating under the same knowledge and authority. (*Id.* at 5.) Finally, the Government argues that the officers were "acting with an objectively reasonabl[e] good faith belief that their conduct was lawful." (*Id.* at 6.)

iii.  *Government's Post-Hearing Memorandum (Doc. 62)*

In addition, the Government submitted a post-hearing memorandum at the same time as Defendant's post-hearing brief. (Doc. 62.) The Government reiterated the conditions that Defendant agreed to upon being paroled, as well as the circumstances leading to the issuance of

the parole warrant. (*Id.* at 2–4.) The Government noted that Defendant's parole officer applied for the parole arrest warrant, which her supervisor approved. (*Id.* at 4, 6.) The Government emphasized that searches of parolees' homes require only reasonable suspicion. (*Id.* at 5.) It argues that Defendant violated the conditions of his parole by possessing firearms, which also constituted a violation of 18 U.S.C. § 922(g)(1). (*Id.* at 6.) The Government asserts that any staleness analysis "depends upon the facts of the individual case, including the nature of the criminal activity and the type of evidence sought." (*Id.* (citing *United States v. Laury*, 985 F.2d 1293, 1314 (5th Cir. 1993); *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978)).) It argues that guns are among those objects likely to be retained, not consumed or destroyed. (*Id.*)

The Government also points to the numerous records Defendant created of his criminal activities, all of which show an open use of weapons rather than any concern for concealing or disposing of the weapons. (*Id.* at 6–7.) Further, the Government argues, that Defendant's social media posts reflect "a love and fondness for firearms[,]" which makes it likely Defendant would keep the firearms he possessed in his residence. (*Id.* at 7.)

>    *iv.  Defendant's Response to United States' Post-Hearing Memorandum (Doc. 64)*

In response, Defendant argues that there is only evidence that he was engaged in criminal activity for a limited period of time compared to the total time that he was on probation. (Doc. 64 at 1.) He implies that officers should have searched Range USA rather than his residence. (*Id.* at 1–2.) He also contends that too much time elapsed between the visits to the firing range and the parole officers' search of his residence. (*Id.* at 2.) He claims that, because his parole officer never observed firearms, there was no basis for the search of his residence. (*Id.* at 2–3.) Defendant further argues that the events shown on the YouTube videos could have taken place "months or years

before the search on October 22, 2023." (*Id.* at 3.) As a result, he argues, there was no reasonable suspicion to search his home.

Defendant insists that the Court should reject the Government's invocation of the collective knowledge doctrine for two reasons: first, because Defendant was already in custody for violating his parole at the time that the search of his residence was conducted, (*id.* at 3–4), and second, because the Government's reliance on the doctrine shows that the search "was merely a subterfuge to help the FBI conduct a search[,]" (*id.* at 4). Defendant notes that the collective knowledge doctrine applies where one officer acts on behalf of another officer and that, here, the government argues that "the parole officers were not *acting on behalf* of the FBI and that [the] FBI was not involved in the search of the residence." (*Id.* at 5.) He maintains that the collective knowledge doctrine applies where "the information was spread across officers who were acting in coordination to achieve the same goal." (*Id.*) On the other hand, Defendant argues, "Louisiana law prohibits parole officers from using their authority as subterfuge to help another police agency that desires to conduct a search, but lacks probable cause." (*Id.* (citing *Bolden*, 13 So. 3d at 1171).) Defendant asserts that the collective knowledge doctrine should not apply here, and the motion to suppress should be granted. (*Id.* at 6.)

## III.   LEGAL STANDARD

The Fourth Amendment protects "against unreasonable searches and seizures" by law enforcement. U.S. Const. amend. IV. Individuals on parole, however, are "significantly diminished" in their "reasonable expectation of privacy" due to their "knowing agreement to the parole condition[s] imposed in accordance with state law." *United States v. Meaux*, 797 F. App'x 892, 892 (5th Cir. 2020) (citing La. R.S. § 15:574.4.2(A)(2)(i) (2015)); *Samson v. California*, 547 U.S. 843, 852 (2006); *United States v. Knights*, 534 U.S. 112, 114 (2001)).

The Supreme Court has concluded "that a warrantless, non-consensual search of a probationer's home on the basis of less than probable cause was '"reasonable" within the meaning of the Fourth Amendment[.]'" *United States v. Keith*, 375 F.3d 346, 349 (5th Cir. 2004) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 880 (1987) (internal citations omitted)). Likewise, in *United States v. Knights*, the Supreme Court "upheld a warrantless search which was conducted pursuant to the terms of the defendant's state probation where law enforcement had reasonable suspicion that criminal activity was occurring." *United States v. Anderson*, 620 F. App'x 365, 366 (5th Cir. 2015) (citing *Knights*, 534 U.S. at 114, 121). In addition, the Supreme Court has stated that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson*, 547 U.S. at 857.

## IV.  ANALYSIS

### A.  Defendant's Status as a Parolee

"'[P]arolees enjoy even less of the average citizen's absolute liberty than do probationers.'" *United States v. Winding*, 817 F.3d 910, 916 (5th Cir. 2016) (quoting *Samson*, 547 U.S. at 850 (internal quotation marks omitted)). The Supreme Court has explicitly "upheld the warrantless non-consensual search of a probationer's home based upon a tip from a police officer that there were or might be guns in the probationer's apartment." *Keith*, 375 F.3d at 349 (citing *Griffin*, 483 U.S. at 870–71). It "found that a warrant requirement would 'interfere to an appreciable degree' with the ability of the probation system to adequately supervise probationers by 'mak[ing] it more difficult for probation officials to respond quickly to evidence of misconduct' and 'reduc[ing] the deterrent effect that the possibility of expeditious searches would otherwise create.'" *Id.* (quoting *Griffin*, 483 U.S. at 876).

Defendant was on parole at the time of the search in question. (Doc. 53-3 at 2.) Louisiana's Division of Probation and Parole received information from the FBI Joint Terrorism Task Force that Defendant had been in possession of ammunition and firearms, in violation of his parole and in violation of federal statute. (*Id.*); *see* 18 U.S.C. § 922(g)(1). According to the incident report, "[o]n October 20, 2023, Supervisor Mitchell received a call from the West Baton Rouge District," advising him of the parole warrant issued against Defendant and "that he likely had weapons in the residence." (Doc. 53-4 at 2.) The report states that multiple probation officers "cleared the residence to ensure that nobody else was inside, prior to conducting a residence check." (*Id.*) In doing so, "multiple firearms were located, underneath a bed, directly across the hall from the subject's bedroom[.]" (*Id.*) In addition, "numerous items[,]" including multiple firearms, weapons, and boxes of ammunition, were found in Defendant's room. (*Id.*) Other weapons were found "in plain view" in other rooms in the house, as were chemicals and fuses. (*Id.*)

Defendant asserts that this was not a residence check but a search. (Doc. 53-1 at 7–8.) The Government concedes that a search occurred but argues that "[a] warrantless search of a parolee's residence is constitutional if supported by reasonable suspicion and authorized by a condition of parole." (Doc. 55 at 4.) Defendant's conditions of parole state: "I agree to visits at my residence or place of employment by my Parole Officer at any time. *I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity.*" (Doc. 55-2 at 2 (emphasis added).) The conditions also state, "I shall not have in my possession or control any firearms or dangerous weapons." (*Id.*)

Defendant specifically objects to the absence of his assigned parole officer during the search of his residence. (Doc. 61 at 4–5.) He points to the definition in the Louisiana Revised Statutes of "probation and parole officer" as meaning either the "probation and parole officer

originally assigned to the parolee[]" or "[a]ny probation and parole officer who is subsequently assigned or directed by the Department of Public Safety and Corrections to supervise the parolee, whether the assignment to the parolee is temporary or permanent." (*Id.* at 5 (quoting La. R.S. § 15:574.4.2).) Defendant argues that the initial search of his residence was a residence check, which he asserts bars any parole officer other than his own assigned parole officer or officers from participating. (*Id.* at 5–6.)

However, the provision of the Revised Statutes that Defendant points to requires that parolees not only "[a]gree to visits at residence or place of employment by the probation and parole officer at any time[]" but also "[f]urther agree[] to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole." (*Id.* at 4.) This second sentence includes no requirement that the searches be conducted by the probation and parole officer. Likewise, Parole Condition Nine states: "I agree to visits at my residence or place of employment by my Parole Officer at any time. I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity." (*Id.* at 4 (quoting Doc. 53-2 at 2).) The second sentence does not require that the searches be conducted by the parolee's assigned parole officer. No Louisiana or federal court has found such a requirement, and indeed, multiple courts have found the opposite. The Louisiana Third Circuit Court of Appeal held that "parolees are subject to searches pursuant to reasonable suspicion by more than just the parolee's supervising officer." *State v. Warren*, 17-1169 (La. App. 3 Cir. 02/28/18) 239 So. 3d 960, 971. Likewise, the Western District of Louisiana has held that "a probation and parole officer," who was not the parolee's assigned parole officer, "could conduct warrantless searches if reasonable suspicion existed." *Bates v. Normand*, 703 F. Supp. 3d 775, 787 (W.D. La. 2023); *see also United States v. Hankton*, 2016 WL 929328, at *6

(E.D. La. Nov. 9, 2016) (allowing a search by the defendant's parole officer and other officers based on reasonable suspicion that the defendant was engaged in criminal activity); *State v. McCarthy*, 2021-00153 (La. 04/20.21) 313 So. 3d 1234, 1236 (per curiam) (upholding the lower court's denial of a motion to suppress (on other grounds) where a search had been conducted by not only the parole officer but also a detective).

The parole officers were therefore constitutionally permitted to conduct a warrantless search, so long as it was supported by reasonable suspicion. *See Anderson*, 620 F. App'x at 366 (citing *Knights*, 534 U.S. at 114, 121).

### B.      Reasonable Suspicion

Louisiana Revised Statutes § 15:574.4.2 provides that a parolee must agree "to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole." La. R.S. § 15:574.4.2(A)(2)(i). It does not state that the criminal activity must have taken place at the property, residence, or vehicle to be searched, nor does it set a time limit on the criminal activity other than "while on parole." *See id.* The Fifth Circuit has previously articulated the standard for reasonable suspicion for a parolee as "requir[ing] no more than that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief . . . that a condition of parole has been or is being violated." *United States v. Scott*, 678 F.2d 32, 35 (5th Cir. 1982); *accord Bates*, 703 F. Supp. 3d at 788; *Dimes v. Tanner*, 2021 WL 3146292, at *7 (E.D. La. June 22, 2021).

In order to search Defendant's home, the parole officers needed only a "reasonable suspicion that criminal activity was occurring." *Anderson*, 620 F. App'x at 366 (citing *Knights*, 534 U.S. at 114, 121). Here, they had information—relayed from the FBI—that Defendant had been not only observed but also recorded in possession and control of firearms, weapons, and

ammunition, in violation of his parole and of 18 U.S.C. § 922(g)(1). Although Probation and Parole did not discover those videos and receipts, they were in possession of them. (Hearing Aug. 14, 2025; *see* Doc. 55-3 at 2.) Even if the parole officers who conducted the search did not personally observe Defendant in possession of firearms or watch the recordings of Defendant in possession of firearms, the collective knowledge doctrine would apply here.

The collective knowledge doctrine applies where "information known by one officer can be imputed to another when assessing whether police had legal basis for a seizure." *United States v. Wright*, 74 F.4th 722, 731 (5th Cir. 2023) (citing *United States v. Zuniga*, 860 F.3d 276, 282–83 (5th Cir. 2017)). Here, Agent Chambers sent a synopsis of his investigation to Darla Green of Louisiana Probation and Parole. (Hearing Aug. 14, 2025.) Kerri Smith of Louisiana Probation and Parole testified that she had reviewed the videos and other information that Chambers had discovered in the course of his investigation. (*Id.*) This information indicated that Quinn had been engaged in criminal activity, in violation of his parole.

Thus, the information that the searching officers possessed was not merely relayed to them by the FBI but by officers within their own agency, in order to execute the goal shared by all of the parole officers (i.e., to execute a parole warrant). (*See id.*) That information—that Defendant was in possession of firearms and ammunition in violation of his parole and federal law—can be imputed to the searching officers in assessing whether they had reasonable suspicion to search Defendant's home. While one of the firearms that Defendant was recorded using was a rental from the firing range, others were not. (Doc. 55 at 2–3.) Defendant carried the weapons openly, purchased the membership at the firing range openly, and posted videos of himself carrying and using firearms on YouTube, all while on parole and prohibited from possessing firearms. (Doc. 55 at 1–3; Doc. 55-2 at 2.) The incident report stated that the searching officers were advised, on the

basis of this evidence, that Defendant likely had weapons at his residence. (Doc. 53-4 at 2.) These parole officers needed only a reasonable suspicion that Defendant had engaged in criminal activity while on parole—that is, possessed a firearm or ammunition—to search Defendant's residence. *See Anderson*, 620 F. App'x at 366 (citing *Knights*, 534 U.S. at 114, 121); *see also United States v. Taylor*, 482 F.3d 315, 319 (5th Cir. 2007) (upholding a warrantless search of a parolee where the "evidence [wa]s sufficient to support a determination that the police had reasonable suspicion that [the defendant] may have been engaged in criminal conduct[]"). The Court finds that they had reasonable suspicion.

    *i. Staleness*

  The parties address the question of staleness with respect to the search. (Doc. 55 at 4–6; Doc. 61 at 8–14; Doc. 62 at 6; Doc. 63 at 4–5.) The Court notes that much of the caselaw surrounding staleness relates to evidence supporting affidavits for warrants, and much of it relates to tips or informants. *See, e.g.*, *United States v. Huerra*, 884 F.3d 511 (5th Cir. 2018); *United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014). This case does not involve a warrant, nor does it involve an anonymous tip, a confidential informant, or any other non-law enforcement source informing the parole officers of Defendant's allegedly unlawful conduct. It is, instead, a case where one law enforcement agency (i.e., the FBI) provided the results of its investigation to another agency (i.e., Probation and Parole). (Hearing Aug. 14, 2025; *see* Doc. 53-4 at 2; Doc. 55-3 at 2.) But to the extent that the staleness doctrine applies here, the Court finds that the information was not stale at the time parole officers searched Defendant's residence.

  "Whether a tip has become stale is not assessed merely by mechanical counting of time between when a tip is received and when it is investigated." *United States v. Rose*, 48 F.4th 297, 306 (5th Cir. 2022) (citing *United States v. Gonzalez*, 190 F.3d 668, 673 (5th Cir. 1999)). "Instead,

it 'depends upon the nature of the tip and the nature of the criminal activity alleged.'" *Id.* (quoting *Gonzalez*, 190 F.3d at 673). "Older tips are not stale if 'the affidavit clearly shows a long-standing, ongoing pattern of criminal activity.'" *Huerra*, 884 F.3d at 516 (quoting *United States v. Craig*, 861 F.2d 818, 822 (5th Cir. 1988)).

The FBI investigation revealed a long-standing pattern of criminal behavior, including: purchasing ammunition from Range USA, in violation of 18 U.S.C. § 922(g)(1), on May 14, 2023; purchasing ammunition from Range USA, in violation of 18 U.S.C. § 922(g)(1), on May 17, 2023; purchasing ammunition and renting a firearm, in violation of 18 U.S.C. § 922(g)(1), on June 29, 2023; possessing firearms and ammunition on June 29, 2023, in violation of 18 U.S.C. § 922(g)(1), which was recorded on video; and renewing a premium membership at Range USA on July 14, 2023, which would allow Defendant to continue to purchase ammunition and firearms, rent firearms, and rent range time from the firing range. (Doc. 55 at 1–3.) As of September 25, 2023, Defendant still had that premium membership. (*Id.* at 1.) As of September 21, 2023, videos of Defendant "wearing military style clothing, wearing Body armor, magazine pouches, and holsters, discharging firearms[,]" were still posted on Defendant's YouTube channel. (*Id.*) "Because this information related to a 'long-standing, ongoing pattern of criminal activity,' it had not gone stale . . . and was thus another factor that properly contributed to [the officers'] determination that reasonable suspicion . . . existed." *United States v. Berry*, 664 F. App'x 413, 419 (5th Cir. 2016) (citing *Craig*, 861 F.2d at 822).

Likewise, here, the information showed a long-standing pattern of criminal activity supporting the parole officers' reasonable suspicion that Defendant had been engaged in criminal activity in violation of the conditions of his parole. Because Defendant was a parolee at the time of the search, no more was necessary. But also, as the Government noted, individuals tend to keep

firearms for long periods of time; thus, information about illegal firearm possession generally does not become stale in mere months. (Doc. 55 at 5; Doc. 62 at 6 (citing, *inter alia*, *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008).)

### C.    Reasonable Mistake of Law

Finally, the Court notes that "[r]easonable suspicion can rest on a mistaken understanding of the law if the mistake is objectively reasonable." *United States v. Cedillo*, 855 F. App'x 954, 955 (5th Cir. 2021) (citing *Heien v. North Carolina*, 574 U.S. 54, 60, 66 (2014)). If the Louisiana Legislature did intend to raise the search threshold to require that parole officers have a reasonable suspicion that the parolee be engaged in criminal activity within a specific timeframe of the search, or to require that the parole officers believe the criminal activity is tied to the residence, then the Court finds that any mistaken understanding by the parole officers was objectively reasonable.

## V.    CONCLUSION

Accordingly,

Defendant Zaccheus Quinn's *Motion to Suppress* (Doc. 53) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>October 17, 2025</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**